AO 91 (Rev. 11/11) Criminal Complaint

AUSA: Caitlin Casey Telephone: (313) 226-9100
Special Agent: Peter Leahey Telephone: (313) 234-4000

# UNITED STATES DISTRICT COURT

for the

Eastern District of Michigan

United States of America
v.
Juan Romo-Padilla

Case No. 26-mj-30542

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of November 19, 2025 to September 4, 2026 in the county of Wayne in the Eastern District of Michigan, the defendant(s) violated:

| *Code Section* | *Offense Description* |
| --- | --- |
| 18 U.S.C. § 1956(h) | Conspiracy to Launder Monetary Instruments. |
| 18 U.S.C. § 1956(a)(1)(B)(i) | Money Laundering. |
| 18 U.S.C. § 1956(a)(3) | Laundering of Represented Drug Proceeds. |
| 18 U.S.C. § 1960(b)(1)(C) | Knowingly Transmitting Criminal Proceeds. |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

[signature]
*Complainant's signature*

Peter Leahey, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: September 4, 2026

[signature]
*Judge's signature*

City and state: Detroit, MI

Hon. Elizabeth A. Stafford, United States Magistrate Judge
*Printed name and title*

# Affidavit

I, Peter Leahey, being duly sworn, depose and state the following:

## I. Introduction

1. I am a Special Agent ("SA") of the United States Drug Enforcement Administration ("DEA"). I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I have been employed as a Special Agent with the DEA since May 2018 and am presently assigned to the DEA Division Office in Detroit, Michigan. Prior to my employment with DEA, I was employed with the Federal Air Marshal Service as a Federal Air Marshal. I have successfully completed a nineteen (19) week DEA Basic Agent Training Academy at the Drug Enforcement Administration Academy in Quantico, Virginia. This training included instruction in the investigation of federal drug violations, including, but not limited to, Title 21, United States Code, Sections 841(a)(1) and 846.

2. I have participated in and led numerous investigations related to illegal drug trafficking, among other things, have conducted or participated in surveillances, executed of search warrants, and debriefed informants related to drug trafficking and money laundering. I have drafted affidavits for search warrants including tracking of vehicles, cellular phones, and searches of residences

and electronic devices. I also consult with other agents with extensive experience in drug trafficking investigations. As a result, I am familiar with common practices to promote and facilitate drug trafficking and money laundering.

3. Additionally, I have participated in many aspects of money laundering and narcotics investigations including but not limited to, financial analysis, toll analysis, undercover operations, conducting physical and electronic surveillance and executing search and arrest warrants. I have participated in narcotics investigations either as a case agent or in a supporting role. I have assisted on the execution of several federal and state narcotics search warrants that resulted in the arrest of suspects and seizure of narcotics. I have debriefed defendants, informants, and witnesses who had personal knowledge regarding narcotics trafficking organizations. Additionally, I have participated in many aspects of drug investigations including but not limited to, undercover operations, conducting physical and electronic surveillance, and arrests. As a result, I am familiar with narcotics traffickers' methods of operation including the distribution, storage, manufacturing, and transportation of narcotics and the collection of money proceeds of narcotics trafficking.

4. I know that it is common for money launderers and drug traffickers to use business fronts and nominee accounts to conceal the true source and nature of their illicit proceeds. Structuring, which is the act of breaking up bulk cash and

conducting transactions in amounts under the reporting threshold to avoid bank reporting requirements, is also a common tactic used by drug traffickers and money launderers to avoid detection by law enforcement.

5. I am aware of the following information from several sources, including but not limited to, my own personal observations and participation in this investigation and my review and analysis of oral and written reports.

6. I make this affidavit from personal knowledge based on my participation in this investigation, including the writing and review of reports by myself and/or other law enforcement agents, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. The information outlined below is provided for the limited purpose of establishing probable cause and does not contain all the details or facts related to this investigation.

## II. Investigation and Probable Cause

7. There is probable cause to believe that during the years of 2025 through 2026, Juan ROMO-PADILLA did knowingly commit violations of Title 18, United States Code Section 1956(h), conspiracy to launder monetary instruments; Title 18, United States Code, Section 1956(a)(1)(B)(i), laundering of monetary instruments – concealment; Title 18 United States Code Section 1956(a)(2), international money laundering; Title 18 United States Code Section

1956(a)(3), laundering of represented drug proceeds; Title 18, United States Code, Section 1960(b)(1)(C), knowingly transmitting criminal proceeds; and violations of the Bank Secrecy Act, Title 31, United States Code Sections 5313 and 5324.

8. In September 2024, IRS-CI and DEA began investigating LA POSADA Restaurant and Money Service Business (MSB) in Detroit, Michigan. Agents identified ROMO-PADILLA, the owner of LA POSADA, as an international third-party money launderer using his business to launder potentially millions of dollars to Mexico.

**Undercover Operations at LA POSADA**

9. On November 19, 2025, two IRS-CI Undercover Agents (UCAs) spoke with ROMO-PADILLA and his relative, Guadalupe Romo-Lopez at LA POSADA. UCA-1 spoke with Romo-Lopez at the MSB counter and conducted a "test transaction" by sending $1,000 to a payee in Michoacan, Mexico through Western Union. The purpose of this initial transaction was simply to determine if IRS-CI could deem the funds "recoverable" by working with Western Union to have the money stopped and refunded.

10. Romo-Lopez explained to UCA-1 that she could only send up to $900 without an ID and up to $3,000 at a time with an ID. Romo-Lopez advised UCA-1 that if they wanted to send more than $3,000 at a time, they should wait a few days before sending more or else you will need to provide a social security

number. During this time, UCA-2 met and spoke with ROMO-PADILLA while paying the bill at the register for their food. The $1,000 "test transaction" was sent using UCA-1's undercover identity.

11. On December 1, 2025, the two IRS-CI UCAs returned to LA POSADA. The UCAs encountered Romo-Lopez behind the counter. UCA-1 asked Romo-Lopez if the UCAs could speak with the owner somewhere private. Romo-Lopez referred the UCAs to her cousin, later identified as Juan Romo Jr., who took the UCAs to a back room/office of LA POSADA. Romo Jr. advised the UCAs that his father, ROMO-PADILLA, was the owner of LA POSADA. UCA-1 informed Romo Jr. that they wanted to send money to Mexico without using their IDs. Romo Jr. advised the UCAs that they could send up to $3,000 each at a time, and up to $9,000 per month without having any issues. Romo Jr. told the UCAs that the only way to send more would be for the UCAs to find other people to send the money for them. Romo Jr. then told the UCAs that his dad, ROMO-PADILLA, had done favors for people in the past and they would have to speak with him.

12. Romo Jr. provided the UCAs with ROMO-PADILLA's phone number (313-***-8389) and told them to reach out to him via WhatsApp. Between December 3, 2025, and March 24, 2026, UCA-1 communicated with ROMO-PADILLA via WhatsApp on his 313-***-8389 phone number to establish a time and date for their next meeting.

***ROMO-PADILLA agrees to send $10,000***

13. On March 24, 2026, UCA-1 met with ROMO-PADILLA while he was behind the MSB counter at LA POSADA. UCA-1 told ROMO-PADILLA that he needed to send money to Michoacan, Mexico. ROMO-PADILLA eventually led UCA-1 to his back office. UCA-1 explained to ROMO-PADILLA that he had $10,000 and a list of five payee names in Michoacan and that he wanted to send the money without his name being listed as the sender.

14. ROMO-PADILLA agreed to send $10,000 to the five different payee (receiver) names in Michoacan and told UCA-1 that he would charge a 5% fee for providing the sender names, plus Western Union's fees, for a total fee of $700 to facilitate the transactions.

15. UCA-1 returned to the back office with ROMO-PADILLA where he provided ROMO-PADILLA with a list of five payee names with various cities in Michoacan, Mexico and the brown paper bag with $10,700 USC in various denominations. ROMO-PADILLA counted the money using a money counter in his back office. ROMO-PADILLA told UCA-1 that it would take a day or two to send the money so that that the transfers would not be labeled as suspicious and that he would send him pictures of the receipts once the transactions were completed from ROMO-PADILLA's Mexican phone number (52-***-***-5393).

16. During their conversation, UCA-1 informed ROMO-PADILLA that he was involved in the sale of cocaine. ROMO-PADILLA informed UCA-1 that if UCA-1 ever wanted to send more money and could not get enough payee names in Mexico, he has a nephew he pays in Mexico who can provide ROMO-PADILLA with payee names, for an additional fee. ROMO-PADILLA told UCA-1 that his nephew gathers the individuals, and they go with him to have the money picked up in Mexico. An excerpt of this recorded conversation is below:

- **ROMO-PADILLA:** …But I'm telling you, the money from here I'm telling you, over there it would just be that you have someone, someone reliable who...
- **UCA-1:** That part I have no problem at all over there.
- **ROMO-PADILLA:** Here what I do with others too, for example, I have a nephew there in the town, you understand? He... he gets the people over there, I pay him. And he gathers them, and then they go pick it up there with him. I don't know how far this is from Michoacán.
- **UCA-1:** Yes, right now I just want to send it there, and the people already gather there. Over there I have the boss who takes care of everything over there in that area. I take care of here, this area I go from Ohio to Chicago and all that and then, well I'm everywhere. Anyway, like I said, we move the money easily, but I'd like something easier, more direct and that way it's faster too. Without getting into other problems with all that. You know how the work is, right? Well, I don't know if you know much, but you already have an idea of what I do, right?
- **ROMO-PADILLA:** Yes.
- …[Non-pertinent conversation]…
- **UCA-1:** Our work keeps going and going.
- **ROMO-PADILLA:** Yes?
- **UCA-1:** Not that slow. We have to find ways anyway, right? And the work is good, the... yes, no, yes. And we have a lot there. The people here, the consumers, they keep going and going and well there's no problem. The cocaine, it goes like that constantly. And well yes, no problem. Everything is fine. Like I said, there could be more of that if you want to keep it going and... you just tell me and...
- **ROMO-PADILLA:** Well I'm just telling you, after seeing this, I'm telling you everything with discretion.
- **UCA-1:** Perfect. Yes, no.
- **ROMO-PADILLA:** Anything you need just ask.

17. On March 27, 2026, UCA-1 received a WhatsApp message from ROMO-PADILLA's Mexican phone number 52-***-***-5393. The message contained two photos showing five Western Union receipts. The receipts were

dated March 24, 2026, and showed a total of $10,200 ($10,000 in transfers and $200 in Western Union fees and taxes) sent in various amounts utilizing the five payee names provided to ROMO-PADILLA.

18. The receipts also listed four different sender names using addresses in Michigan (one of the names was used for two of the transactions). These sender names had been provided by ROMO-PADILLA, pursuant to his agreement with UCA-1. The senders appear to be people from Mexico. However, the phone numbers and addresses listed were Detroit based and not associated with the sender names. Further, several of the addresses were either spelled incorrectly or were invalid, consistent with ROMO-PADILLA providing fabricated sender names to conceal the source and ownership of the proceeds.

***ROMO-PADILLA agrees to send $25,000***

19. On April 14, 2026, UCA-1 again met with ROMO-PADILLA while he was behind the MSB counter at LA POSADA. UCA-1 told ROMO-PADILLA that he needed to send more money to Michoacan, Mexico. ROMO-PADILLA told UCA-1 he could do it as long as he had different names to send the money to in Mexico.

20. ROMO-PADILLA then led UCA-1 to his back office where UCA-1 provided ROMO-PADILLA with a brown paper bag containing $25,000 USC in various denominations and a list of 12 payee names with various cities in

Michoacan, Mexico. ROMO-PADILLA agreed to send the transactions for a 5% fee for providing the sender names, plus Western Union's fees, totaling approximately $1,650. UCA-1 told ROMO-PADILLA to take the fee directly from the $25,000. ROMO-PADILLA put the bag containing the $25,000 in a drawer in the office and informed UCA-1 he would conduct the transactions and send him pictures of the receipts once completed, in approximately one week.

21. UCA-1 informed ROMO-PADILLA that he was getting a "big shipment" in the Detroit area and wanted to know how much he could send through LA POSADA. UCA-1 asked ROMO-PADILLA if $100,000 would be too much to send at once. ROMO-PADILLA explained that he could send that much money, but that it would just take more time to break up the transactions.

22. During their conversation, UCA-1 informed ROMO-PADILLA that the "shipment" was cocaine. ROMO-PADILLA told UCA-1 that it would not be an issue and that he has a partner who helps him log these transactions.

23. At some point after their meeting on April 14, 2026, ROMO-PADILLA learned that the Western Union transactions from the March 24, 2026 meeting had been stopped.

24. When UCA-1 did not receive any receipts for the $25,000 wire transfer from ROMO-PADILLA, UCA-1 contacted ROMO-PADILLA through WhatsApp. ROMO-PADILLA told UCA-1 (both in text messages and over voice

calls) that he was having trouble with Western Union and could not send the $25,000 until they "unblocked" some of his transactions.

25. During one of these calls, ROMO-PADILLA told UCA-1 that he is under an audit with Western Union, but that once the issues with Western Union were sorted out, he would send the $25,000 using a different corporate MSB.

26. I know from my training and experience that it is often difficult for complicit MSB agents to structure bulk cash due to strict anti-money laundering rules instituted on the agent by the corporate MSB, such as Western Union. I am aware that a corporate MSB occasionally rejects wire remittals from its agents if certain money laundering or Bank Secrecy Act "red flags" are observed.

27. Based on a review of financial records, it appears that ROMO-PADILLA still had Western Union services. However, I believe ROMO-PADILLA's reluctance to conduct these future transactions through Western Union was based on ROMO-PADILLA's belief that anti-money laundering regulations had caused the previous transactions to be stopped.

***ROMO-PADILLA uses ViAmericas to conduct transfers***

28. From May 15 to June 30, 2026, ROMO-PADILLA sent UCA-1 pictures through WhatsApp of ViAmericas receipts, each totaling $2,999.99 USD after taxes and fees. The receipts show that the money was sent using different sender names with addresses in Michigan provided by ROMO-PADILLA.

Preliminary investigation into these senders shows that the senders appear to be people from Mexico but with phone numbers and addresses based in Detroit and Oklahoma. As before, the phone numbers and addresses were not associated with the sender names, consistent with ROMO-PADILLA providing fabricated sender names to conceal the source and ownership of the proceeds.

29. The payee names used on the receipts were from those that were provided to ROMO-PADILLA during the undercover operation. The eight receipts sent by ROMO-PADILLA, totaling approximately $23,999.92, are as follows:

- May 15, 2026, two receipts for $2999.99 each.
- May 20, 2026, two receipts for $2999.99 each.
- May 27, 2026, two receipts for $2999.99 each.
- June 22, 2026, one receipt for $2999.99.
- June 30, 2026, one receipt for $2999.99.

***ROMO-PADILLA agrees to send $47,500***

30. On August 1, 2026, UCA-1 met with ROMO-PADILLA while he was behind the MSB counter at LA POSADA. ROMO-PADILLA walked UCA-1 to the back office of LA POSADA where UCA-1 told ROMO-PADILLA that he needed to send more money to Michoacan, Mexico. ROMO-PADILLA agreed to send the money, and UCA-1 provided ROMO-PADILLA with $47,500 USC in various denominations and a list of approximately 20 payee names with various

cities in Michoacan, Mexico. Again, ROMO-PADILLA agreed to send the transactions for a 5% fee for providing the sender names, plus the corporate MSB fees, totaling approximately $2,375. UCA-1 told ROMO-PADILLA to take the fee directly from the $47,500. ROMO-PADILLA used a money counter to confirm the amount was correct and put the $47,500 in a drawer in the office and informed UCA-1 he would conduct the transactions and send him pictures of the receipts once completed, within approximately two weeks.

31. During this meeting, ROMO-PADILLA said to UCA-1, “If it’s too burned, don’t give it to me because last time I lost more than ten thousand dollars.” Investigators believe ROMO-PADILLA is referring to the $10,000 he sent through Western Union that was temporarily held up in Western Union’s system.

32. ROMO- ROMO-PADILLA then told UCA-1 that he can send the $47,500 quickly and before ROMO-PADILLA leaves for Mexico in approximately two weeks. He also told UCA-1 that he will send the receipts through “the other phone” which investigators believe ROMO-PADILLA is referring to his Mexican phone number.

33. From August 3, 2026, to August 22, 2026, ROMO-PADILLA sent UCA-1 pictures through WhatsApp of ViAmericas, Barri Group and Ria Financial receipts ranging between $2,000 and $2,999.99 after taxes and fees. As before, the

receipts show that the money was sent using different sender names with addresses in Michigan. These sender names were provided by ROMO-PADILLA.

34. The payee names used on the receipts were from those that were provided to ROMO-PADILLA by the UCA. The fifteen receipts sent by ROMO-PADILLA, totaling approximately $41,996.94, are as follows:

- August 3, 2026, three ViAmericas receipts, for $2999.99 each.
- August 5, 2026, one Barri Group receipt and one Ria Financial receipt for $2999.99 and $2500.01, respectively.
- August 6, 2026, one Barri Group receipt and one ViAmericas receipt for $2500, each.
- August 8, 2026, two ViAmericas receipts and one Barri Group receipt for $2,000.00, $2,500.00 and $2,999.00, respectively.
- August 10, 2026, two Barri Group receipts for $2999.99, each.
- August 17, 2026, one Barri Group receipt and one ViAmericas receipt for $2,999.00 and $2,999.99, respectively.
- August 22, 2026, one Barri Group receipt for $2999.00.

**Search Warrants at LA POSADA and ROMO-PADILLA's Residence**

35. On September 2, 2026, Magistrate Judge David R. Grand, Eastern District of Michigan, authorized search warrants for 1374 Moran Ave, Lincoln

Park, Michigan (ROMO-PADILLA's Residence) and 1930/1932 Springwells St., Detroit, Michigan (La Posada).

36. On September 3, 2026, investigators searched ROMO-PADILLA's residence. While clearing the residence, investigators detained ROMO-PADILLA. ROMO-PADILLA informed agents that there was approximately $50,000 in the hallway closet that was for his restaurant.

37. During the search of the hallway closet, investigators discovered a large amount of a United States currency located in two separate backpacks. Most of the currency was banded in rubber bands. One band of United States Currency was wrapped with a handwritten list of names and a listed amount of $47,500. Another bundle of currency had multiple money wire receipts located inside of the bundle. The currency was not officially counted, but it is believed to be approximately $80,000. Investigators also discovered ledgers with dollar amounts and money remitter companies listed.

38. Investigators also executed a search warrant at La Posada. During the search, investigators discovered bulk currency located in a safe and in clothing, money wire receipts, ledgers with sender/receiver information, and a box with approximately 50 forms of identification.

39. In the back room, agents found photocopies of identifications, lists with names and addresses for senders or payees, and also the lists of names of payees provided by UCA-1.

## Conclusion

40. Based on the facts established throughout this affidavit, probable cause exists to believe that Juan ROMO-PADILLA did knowingly commit violations of Title 18, United States Code Section 1956(h), conspiracy to launder monetary instruments; Title 18, United States Code, Section 1956(a)(1)(B)(i), laundering of monetary instruments – concealment; Title 18 United States Code Section 1956(a)(2), international money laundering; Title 18 United States Code Section 1956(a)(3), laundering of represented drug proceeds; Title 18, United States Code, Section 1960(b)(1)(C), knowingly transmitting criminal proceeds; and violations of the Bank Secrecy Act, Title 31, United States Code Sections 5313 and 5324.

Peter Leahey, Special Agent
Drug Enforcement Administration

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Elizabeth A. Stafford

Honorable Elizabeth A. Stafford
United States Magistrate Judge

Dated: September 4, 2026